UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BELINDA KAY ALBERALLA,

                        Plaintiff,

                                                        **REPORT AND**
                                                        **RECOMMENDATION**

          v.
                                                        13-CV-881-RJA

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

## I.   INTRODUCTION

        The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b)

(Dkt. No. 9). Pending before the Court are cross-motions for judgment on the pleadings by

plaintiff Belinda Kay Alberalla ("Alberalla") (Dkt. No. 17) and the Commissioner of Social

Security ("Commissioner") (Dkt. No. 18). Alberalla argues that medical records and opinions

received by the Appeals Council undermine the decision of the Administrative Law Judge

("ALJ"), and therefore the Appeals Council erred by affirming the ALJ's decision. Alberalla

argues further that because the ALJ failed to properly develop the record, his residual functional

capacity determination was unfounded and the Commissioner erred by adopting it. Additionally,

Alberalla asserts that the ALJ prevented her from testifying about her Post-Traumatic Stress

Disorder ("PTSD") during the hearing, and the ALJ subsequently failed to address the

impairment in his decision. Alberalla contends that the Commissioner committed legal error

requiring remand by then adopting this decision. Finally, Alberalla asserts that the ALJ failed to

accurately portray Alberalla's limitations when posing hypothetical questions about job availability to the Vocational Expert, and that the Commissioner erred by adopting a decision that relied on the Vocational Expert's response to these hypotheticals. The Commissioner responds that the ALJ's residual functional capacity finding is supported by substantial evidence in the record, that the ALJ sufficiently developed the medical record, that the ALJ properly relied on the Vocational Expert's testimony, and that no evidence submitted to the Appeals Council required remand.

The Court held oral argument on July 10, 2014. (Dkt. No. 19). For the reasons below, the Court respectfully recommends granting Alberalla's motion (Dkt. No. 17) in part, vacating the Commissioner's determination, and remanding the case for the purpose of completing the medical record and for reassessment of mental and physical disability. The Court recommends denying Alberalla's motion without prejudice to the extent that it seeks any other relief. The Court further recommends denying the Commissioner's motion (Dkt. No. 18).

## II.   BACKGROUND

### A. *Procedural History*

Alberalla filed a Title II application for a period of disability and disability insurance benefits ("DIB") on September 30, 2010, which was denied on January 19, 2011. (Certified Administrative Record at 91, hereinafter designated as [91].) On her September 30, 2010, application for DIB, Alberalla indicated that she intended to file for Supplemental Security Income ("SSI") as well. [97.] The record indicates that Alberalla applied for SSI on January 29, 2011. [170-177.] Alberalla alleged that she has been disabled since January 24, 2010, due to a "plugged" aorta, depression, anxiety, PTSD, liver disease, and a circulatory problem. [214.] The record does not indicate when Alberalla's application for SSI was initially denied. On January

2

26, 2011, Alberalla requested a hearing before an ALJ. [110-111.] Alberalla's hearing request

was acknowledged on January 31, 2011, [112-118.] On May 16, 2012, Alberalla and her

attorney, Kelly Laga, appeared before ALJ Bruce Mazzarella for a hearing. [35.] The ALJ found

Alberalla not disabled on June 18, 2012. [7-25.] Alberalla requested the Appeals Council review

the ALJ's decision on August 16, 2012. [33-34.] On July 2, 2013, the Appeals Council denied

Alberalla's request for review of the ALJ's decision, at which point the ALJ's decision became

the final decision of the Commissioner. [1-6.] Alberalla commenced this case by filing a

Complaint on August 30, 2013. (Dkt. No. 1.)

## B. *Factual and Medical Background*

Alberalla was born on November 30, 1967, and was 44 years old at the time of the ALJ's

decision. [40-41.] She attended school through seventh grade and never obtained a General

Educational Development ("GED") certification. [45.] Prior to the alleged onset date of her

disability, Alberalla had worked two cleaning jobs and as a bus aide. [43.]

On April 13, 2010, Alberalla submitted to a consultative examination at the request of the

SSA. [314.] She was examined by Donna Miller, D.O., to whom she reported that she suffered

from peripheral vascular disease ("PVD"), hepatitis C, anxiety, and depression. [*Id.*] During the

examination, Alberalla was unable to walk on her heels or toes due to pain. [315.] Dr. Miller

diagnosed Alberalla with PVD, hepatitis C, hypothyroidism, and tobacco abuse, and opined that

Alberalla would have mild limitations with prolonged walking. [317.]

Alberalla submitted to a psychiatric evaluation with Rachel Hill, Ph.D., on April 13,

2010, as well. [308.] This evaluation revealed that Alberalla "generally related adequately";

appeared older than her stated age; was poorly groomed; her gait was "not quite right with a right

leg limp"; her motor behavior was "a little odd" including rocking and wringing her hands; her

3

affect was depressed, anxious, and tense; she could not do multiplication problems; and she could not remember two objects after five minutes. [311.] Dr. Hill opined that Alberalla could follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration; she further offered that "[p]sychologically, I think she can maintain a regular schedule." [311-312.] Additionally, Dr. Hill noted that Alberalla could learn new tasks, "although I do not think she can be real fast at it," and she could perform complex tasks independently. [312.] Dr. Hill then commented that Alberalla "relates adequately with others. I think she has some problems dealing with stress. Her greatest difficulties are being caused by physical problems, and those would have to be assessed by a physician, but she also has some psychiatric problems." [Id.] As a result of her examination, Dr. Hill diagnosed Alberalla with major depressive disorder, which she characterized as "mild to moderate"; opioid dependence and abuse, which she noted was in remission; cannabis dependence and abuse, which she also noted was in remission; a plugged aorta; low thyroid; and hepatitis C. [Id.] Regarding Alberalla's prognosis, Dr. Hill opined that "[p]sychiatrically, I think it is probably fair." [Id.]

On January 10, 2011, Alberalla submitted to another internal medicine consultative examination at the behest of the SSA. [587.] She was examined by Nikita Dave, M.D., to whom she stated that she had "atherosclerosis or perhaps occluding thrombus in the aorta, descending portion, since two years." [Id.] Alberalla reported that she suffered from significant pain in both lower extremities anteriorly when walking more than about 200 feet. [Id.] Alberalla went on to note that she was born with her bowel attached to her ovaries, though the condition was not diagnosed until the early 1990s and she had no symptoms. [Id.] Additionally, Alberalla reported that she was diagnosed with hepatitis C, PTSD, panic, anxiety, and depression. [Id.] Dr. Dave

4

notes that Alberalla was five foot one inch tall and weighed 196 pounds, classifying her as moderately obese. [588.] Upon examining Alberalla, Dr. Dave found that she had pitting edema, +2, to the knees, affecting both legs. [589.] As a result of his examination, Dr. Dave diagnosed Alberalla with "aortic atherosclerosis or [sic] thrombus, two years," noting "[p]lease see vascular surgery notes in this regard"; panic; anxiety; PTSD; depression; substance abuse, which he noted had been in remission since 2003; marijuana use, which he noted had been in remission since 2008; chronic mild tobacco use; status post bilateral carpal tunnel surgery and ganglion cystectomy with resolution; status post tubal pregnancies; and hepatitis C, pending evaluation and treatment. [590.] Dr. Dave indicated that Alberalla's prognosis was "[f]air," and opined that she had a moderate limitation for walking more than 200 feet due to claudication. [*Id.*] He further noted that Alberalla "may require frequent rest breaks and comfort intervals for standing and walking," and that she "may benefit from more sedentary types of activities and help with smoking cessation." [*Id.*]

On January 10, 2011, Alberalla also submitted to another psychiatric consultative evaluation at the SSA's request, performed by Susan Santarpia, Ph.D.. [581.] Alberalla reported to Dr. Santarpia that she was previously diagnosed with panic attacks, anxiety, PTSD, and depression, and that she was currently seeing Dr. Mostert for psychotropic medication management and a woman named Nancy for counseling, both of whom were provided by the Erie County Medical Center ("ECMC"). [*Id.*] Alberalla also indicated that her PTSD diagnosis was secondary to being raped when she was 13 years old and to assault at the hands of her father when she was a child. [*Id.*] Alberalla further reported to Dr. Santarpia that she suffered from onset as well as maintenance insomnia, waking approximately eight times per night; increased appetite, along with a 50 pound weight gain; depressive symptoms, including fluctuating

dysphoric mood, hopelessness, and loss of usual interest; increased stress due to living with her terminally ill mother; anxiety-related symptoms, including excessive apprehension and worry, restlessness, flashbacks, and nightmares; and situationally specific panic attacks, seemingly triggered by riding the bus or crowded spaces and consisting of roughly thirty minutes of heart palpitations and sweating. [582.] Alberalla also reported that she was experiencing the previously mentioned panic attacks daily. [*Id.*] Dr. Santarpia opined that Alberalla's cognitive functioning was in the low average to borderline range of ability, and that both her insight and judgment were fair. [583.] Alberalla indicated that she was able to dress, bathe, and groom herself and that her husband helped with the cooking, cleaning, laundry, and shopping. [*Id.*] She indicated that she distanced herself from her friends because they were all involved with her when she was using drugs. [*Id.*] Dr. Santarpia opined that Alberalla could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and learn new tasks within normal limits. [584.] She further opined that Alberalla had mild impairments in performing complex tasks independently, making appropriate decisions, relating adequately with others, and appropriately dealing with stress. [*Id.*] Dr. Santarpia specifically noted that Alberalla's "[d]ifficulties are caused by fatigue." [*Id.*] Dr. Santarpia diagnosed Alberalla with a mood disorder which was not otherwise specified ("NOS"), panic disorder without agoraphobia, polysubstance dependence in sustained remission, hepatitis C, and thyroid dysregulation. [*Id.*] She recommended that Alberalla continue with her current psychological and psychiatric treatment, and noted that her prognosis was "[f]air given current compliance with treatment." [*Id.*]

Alberalla's treating physician, James Yossef, M.D., completed a physical residual functional capacity questionnaire on August 13, 2012.[1] [684-688.] Dr. Yossef indicated that he had been treating Alberalla for one year and that she was diagnosed with PVD. [684.] He reported that walking caused pain in Alberalla's legs, for which she took pain medication. [*Id.*] When prompted to indicate how often during a typical workday Alberalla's pain or other symptoms were severe enough to interfere with the attention and concentration necessary for simple work tasks, Dr. Yossef marked "frequently," which is defined here as 34% to 66% of an 8-hour workday. [685.] Dr. Yossef also noted that Alberalla was "[i]ncapable of even 'low stress' jobs," and that she could walk at most one city block without resting or experiencing severe pain. [*Id.*] Dr. Yossef reported that, in a competitive work situation, Alberalla could lift and carry less than 10 pounds occasionally, 10 to 20 pounds rarely, and could not lift 50 pounds. [686.] Notably, Dr. Yossef also indicated that Alberalla would require unscheduled breaks during an 8-hour workday, though he offered no opinion on the frequency or duration of these unscheduled breaks. [*Id.*] Additionally, Dr. Yossef noted that Alberalla could look down, look up, turn her head left or right, and hold her head in a static position frequently; twist, stoop, crouch, or squat occasionally; climb stairs rarely; and never climb ladders. [687.] Dr. Yossef also signed an undated letter that was submitted to the Appeals Council which said that Alberalla's PVD greatly hindered her ability to walk long distances or be on her feet for extended periods of time, and that he did not believe she could work in an occupation which requires her to do so. [695.] Dr. Yossef further opined that Alberalla was not a good candidate for vascular surgery. [*Id.*]

---

[1] This opinion was requested and submitted by Alberalla's attorney after the ALJ rendered an unfavorable decision. The document was submitted to the Appeals Council, at which point it was made a part of the administrative record.

On March 25, 2009, Alberalla was treated at ECMC for worsening bilateral leg pain and paresthesia. [273.] She was diagnosed with chronic bilateral leg arterial insufficiency with claudication. [*Id.*] It was also noted that Alberalla had chest pain which was not clearly cardiac in nature. [274.]

On April 20, 2009, Alberalla was treated at ECMC for bilateral leg pain and for pain in her left wrist. [357.] Neither her femoral nor her DP/PT pulse was palpable. [*Id.*] It was also indicated that Alberalla's leg pain may be caused by bilateral leg claudication. [*Id.*]

On June 02, 2009, Alberalla underwent an "angio left eval right" procedure through ECMC. [366.] James Lukan, M.D., the attending physician, listed obesity when considering Alberalla's past medical history, and noted that the significant findings of the procedure included negative femoral and DP/PT pulses. [367.]

Alberalla was admitted to ECMC on August 17, 2009, due to diffuse sharp chest pain which had persisted for approximately one week; she was discharged the following day. [286.] During her physical examination, Alberalla was anxious and crying, and her EKG on admission initially showed sinus bradycardia in the 50's. [287.] Upon discharge, Alberalla was prescribed Synthroid and buspirone. [*Id.*] Her discharge diagnoses included chest pain, secondary to anxiety; hypothyroidism; dyslipidemia; opioid abuse; PVD; and generalized anxiety disorder. [289.]

James Lukin, M.D., performed an angiogram on Alberalla on August 30, 2009. [284, 285.] Alberalla's diagnosis, before and after the procedure, was bilateral lower extremity ischemia. [284.] Dr. Lukin's findings included "diffuse atherosclerotic disease of the distal aorta with complete occlusion at the bifurcation and rich collaterals that reconstitute in the bilateral lower extremities"; "reconstitution of the right common iliac artery right at the bifurcation with

flow through the internal and external iliacs"; "right common femoral artery patent"; "right profunda femoris patent"; "right superficial femoral artery is patent"; "right popliteal is patent"; "right lower extremity runoff is via peroneal and anterior tibial arteries, the peroneal artery appearing dominant"; "reconstitution of the left internal iliac artery"; "left common iliac artery is not seen"; "reconstitution of distal left external iliac artery"; "diseased left common femoral artery"; "patent profunda femoris and superficial femoral arteries"; "popliteal artery is patent"; "there is three-vessel runoff." [*Id.*] Dr. Lukan reported "due to the rich collaterals that are perfusing the lower extremities as well as the takeoff of a left renal that is quite low and near to the area of occlusion, it is felt that recanalization and stenting would be extremely risky and that instead consideration should be given to an open procedure if anything is done at all." [285.]

Alberalla began mental health counselling with Amanda Es Drumsta, MSW, on December 10, 2009. [534.] Ms. Es Drumsta noted that Alberalla was tearful when talking about her stressors, trauma history, and anxiety. [*Id.*] During her initial appointment, Alberalla reported struggling with constant anxiety and at least one panic attack per day, as well as difficulty sleeping and flashbacks to childhood traumas. [*Id.*] On December 17, 2009, when Alberalla next saw Ms. Es Drumsta, she reported that her panic attacks had been getting worse and that she had to leave work early the day before because of their intensity. [535.] During her December 21, 2009, meeting with Ms. Es Drumsta, Alberalla reported that she was having difficulty coping with her mother's terminal illness, and that she was having several panic attacks per day thinking about her mother dying. [536.] When she met with Ms. Es Drumsta on December 28, 2009, Alberalla reported that she could not fall asleep at night and that when she did, she would wake up with nightmares. [537.] Alberalla further reported that her anxiety had gotten so bad that it affected every aspect of her life. [*Id.*]

On January 12, 2010, Alberalla underwent a non-invasive arterial exam of the lower extremities, which suggested aorto-iliac arterial occlusive disease with a mild flow reduction to the legs at rest bilaterally, with no change from the previous study on May 08, 2009. [474.]

On January 19, 2010, Alberalla informed Ms. Es Drumsta in a counseling session that she had been unable to afford to refill her prescription for Celexa. [540.] On February 2, 2010, Alberalla appeared tired and her affect was flat, and she indicated to Ms. Es Drumsta that she had been struggling. [544.] On February 8, 2010, Ms. Es Drumsta worked with Alberalla on her anxiety and helped her with different ways to alleviate her panic attacks. [545.]

On February 19, 2010, Alberalla informed Ms. Es Drumsta during a session that she was concerned about paying a large bill to the methadone clinic. [546.] She was anxious about what might happen if she were taken off methadone. [*Id.*] Alberalla met with Ms. Es Drumsta several more times in the weeks that followed, reporting largely the same issues. [547-551.] When Alberalla met with Ms. Es Drumsta on March 29, 2010, she reported that she was continuing to have panic attacks, and that she did not feel Celexa was helping with them. [552.]

On April 12, 2010, Alberalla reported to Ms. Es Drumsta that she was struggling with constant anxiety, worrying about everything, and not being able to "shut her brain off." [554.] on April 19, 2010, Alberalla reported to Ms. Es Drumsta that her panic attacks were happening constantly, and she wondered if she "just has a fear of the world in general." [555.] She further indicated that she had always been afraid of her father, that she had many regrets, that she feared losing her husband, and that she feared the future. [*Id.*]

On May 17, 2010, Alberalla underwent a CT examination of the chest with contrast due to severe pain in her left chest. [491.] The exam, conducted at ECMC with Timothy V Jorden, M.D., attending, showed two to three tiny calcifications in the right upper lobe, but showed that

Alberalla's lung fields were otherwise unremarkable. [*Id.*] The examination further showed minimal hilar lymphadenopathy, likely benign and longstanding, and fatty infiltration of the liver. [*Id.*]

On May 06, 2010, Alberalla was treated by Dr. Marcelle Mostert. [342.] Alberalla reported suffering from nightmares every night which sometimes made her afraid of falling asleep. [*Id.*] Dr. Mostert diagnosed Alberalla with panic disorder without agoraphobia, opioid dependence, and frequent nightmares related to PTSD. [*Id.*]

Alberalla underwent a counseling session with Susan L. Schneider, MSW, on June 2, 2010. [346.] During this session, Alberalla indicated that she had tried to hang herself seven years earlier, but did not have any current suicidal or homicidal ideation. [*Id.*] Alberalla stated that her mind "is always thinking," and that she thinks about past abuse at the hands of her father as well as a rape at the age of 13. [*Id.*]

Alberalla was treated again by Dr. Mostert on June 3, 2010, at which point she reported being upset after visiting with her therapist the day before. [341.] Alberalla indicated she had obsessive compulsive disorder ("OCD") symptoms, including compulsive hand washing. [*Id.*] Dr. Mostert indicated that Alberalla was prone to worry and had limited insight, and he increased her prazosin dosage for her nightmares. [*Id.*]

Alberalla began counseling with Nan Abbott, MSW, on June 21, 2010. [347.] During this session, Alberalla complained of compulsive hand washing, and left the session at one point to wash her hands. [*Id.*] Alberalla continued counseling with Ms. Abbott on July 12, 2010, at which point she reported experiencing up to three panic attacks per day. [348.] During the session, Alberalla had a panic attack, during which Ms. Abbott observed her holding her breath. [*Id.*] Ms. Abbott attempted to trace Alberalla's panic attacks back to her first experience, which Alberalla

reported occurred while witnessing her father abuse her mother. [*Id.*] Ms. Abbott noted that "currently [Alberalla] spends her day wallowing in her worry," and that Alberalla "struggles to make progress." [*Id.*]

On August 02, 2010, Alberalla reported to Dr. Mostert during a session that she continued to have three panic attacks per week, and that some nights she was so frightened that her husband had to escort her to the bathroom. [340.] Alberalla expressed concern about taking the GED because of her anxiety, and Dr. Mostert noted that her insight was limited. [*Id.*]

Alberalla continued counseling with Ms. Abbott on August 09, 2010, and she expressed concern that treatment with Dr. Mostert was not helping with her anxiety and panic attacks. [349.] Ms. Abbott indicated that Alberalla's history was significant for abandonment by her biological mother at one year old, and both physical and emotional abuse by her father until she was 24 years old. [*Id.*] When Alberalla met with Ms. Abbott again on August 23, 2010, she indicated she was still having panic attacks and she could not refill her prescription of Seroquel because of the price. [350.]

On September 09, 2010, Alberalla was "frantic" during a treatment session with Dr. Mostert because she had been unable to refill her Seroquel prescription and feared relapse. [339.] Alberalla's Medicaid had not begun before she ran out of Seroquel, and she felt too overwhelmed to try to overcome her anxiety with breathing or cognitive techniques. [*Id.*] Dr. Mostert gave her a prescription for thioridazine as a temporary substitute. [*Id.*]

During a session with Ms. Abbott on September 13, 2010, Alberalla reported that she felt pain when visualizing climbing stairs due to pain her blocked aorta caused her when climbing stairs in real life. [570.] During a session on September 20, 2010, Ms. Abbott suggested

Alberalla undergo Eye Movement Desensitization and Reprocessing ("EMDR")[2] trauma treatment, but Alberalla was resistant because she feared re-experiencing the trauma. [571.]

On October 07, 2010, Alberalla was treated by Dr. Mostert, and she had just started taking Seroquel again after she had been unable to afford it. [338.] During this session, Alberalla requested that she be taken off prazosin because she felt it was not helping with her nightmares. [Id.] Alberalla reported that she was "very uneasy" about talking to her therapist about past traumas, and that she was having frequent panic attacks that included chest pain. [Id.]

During a session with Ms. Abbott on November 01, 2010, Alberalla vented and organized her feelings about her mother's continued decline. [337.] On November 15, 2010, Alberalla told Ms. Abbott that she was dreading an agreement to spend Christmas with her father, as she feared a confrontation. [576.]

On November 02, 2010, Alberalla returned to ECMC for treatment of her right leg claudication due to a concern that it was worsening. [495.] Her pulse was not palpable, and it was indicated that Alberalla had a distal aortic occlusion. [Id.] On December 21, 2010, Alberalla continued treatment for her vascular problems with Dr. Raphael Blochle, at which point her pain was at a moderate level. [580.]

On December 15, 2010, Alberalla underwent a non-invasive arterial examination of the lower extremities with duplex imaging through ECMC, which revealed aorto-iliac arterial occlusive disease with mild flow reduction to the leg and digits bilaterally at rest, and moderate flow reduction to the leg bilaterally post-exercise. [578.] This study showed no significant change from the May 8, 2009, study. [Id.] Alberalla returned for a follow-up with physician's assistant Eamon McCallion on March 15, 2011, at which point she had cut down to two cigarettes daily and had non-palpable DP/PT. [637.] Alberalla was prescribed ECASA. [638.]

---

[2] EMDR is a relatively new type of psychotherapy which is sometimes used to treat PTSD.

On May 27, 2011, Alberalla was treated at ECMC and assessed with hypothyroidism, PVD, bilateral leg pain, atypical chest pain, and a hepatitis A six month shot was administered. [657.] Alberalla was suffering from sharp shooting pains from her lower back to both legs and daily chest cramps, and her deep tendon reflexes were negative at her ankle. [*Id.*] Alberalla received her second hepatitis A injection on July 28, 2011. [659.] Alberalla was treated by Dr. Yossef on August 29 and again on September 12, 2011, for PVD and claudication. [661, 663.] An ultrasound performed on November 7, 2011, showed mild hepatic steatosis of the liver, along with borderline distention of extra hepatic bile ducts. [667.]

On November 11, 2011, Alberalla was treated by Dr. Blochle at ECMC, and Dr. Blochle reported that Alberalla had quit smoking two months prior and was on aspirin and statin. [646.] A noninvasive arterial exam of the lower extremities was performed on November 22, 2011, which showed aorto-iliac arterial occlusive disease with mild flow reduction at rest bilaterally and mild flow reduction to the digits bilaterally. [665.] Post-exercise, this showed mild flow reduction on the right and mild to moderate flow reduction on the left. [*Id.*] Compared to the previous study, conducted on December 15, 2010, this study showed somewhat decreased flow post exercise. [*Id.*]

Alberalla was evaluated by Wendy L. Weinstein, M.D., on January 12, 2012. [641-644.] Alberalla had been experiencing ongoing symptoms of panic, depression, OCD, and PTSD, and indicated that her PTSD was secondary to a rape and abuse by her father and that she had been suffering from nightmares and flashbacks. [641.] Alberalla also reported that she suffered from panic attacks during which she could not breathe, had chest pain, and felt like she was dying. [*Id.*] Dr. Weinstein assessed Alberalla with major depression, panic disorder without

agoraphobia, generalized anxiety disorder, PTSD, OCD, hypothyroidism, asthma, coronary artery disease, and high cholesterol, and assessed Alberalla with a GAF score of 50.[3] [643.]

On March 12, 2012, Alberalla was treated by Dr. Yossef for shortness of breath with exertion, hyperlipidemia, PVD, and gastroesophageal reflux disease ("GERD"). [677.] On March 13, 2012, she was treated by Jeffrey M. Carrel, DPM at Podiatry Affiliates, PC. [690-691.] Dr. Carrel indicated that Alberalla had claudication pain and numbness of the forefoot with walking, where her foot would fall asleep and then feel pain. [690.] Dr. Carrel assessed Alberalla with joint ankle and foot pain, with probable arterial occlusion, and PVD. [691.]

Alberalla met with Dr. Weinstein on April 12, 2012, and reported that her mother had recently passed away. [652.] When Alberalla met with Dr. Weinstein again on May 03, 2012, she reported that she did not like going home, that she was constantly crying, and that she felt guilty. [653.] She indicated that she was still experiencing panic while on Klonopin. [*Id.*] On June 08, 2012, Alberalla told Dr. Weinstein that she was only getting two hours of sleep per night because her "brain just keeps running and running," and that her mood was "like a rollercoaster." [654.]

## III. DISCUSSION

### A. *Standard of Review Generally*

The only issue to be determined by this Court is whether or not the ALJ's decision that Alberalla was not disabled is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

---

[3] Global Assessment of Functioning ("GAF") considers psychological, social and occupational functioning on a hypothetical continuum of mental health-illness. This assessment does not include impairments in functioning due to physical limitations. A score of 50 indicates serious symptoms. *The American Psychiatric Association Diagnostic & Statistical Manual of Mental Disorders* (4th ed., rev. 2002), *available at* LEXIS (section titled "Multiaxial Assessment").

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For the purposes of determining Social Security disability insurance benefits, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

An individual will only be found to have such a disability if her "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

The initial burden of showing that her impairment prevents her from returning to her previous type of employment falls on Alberalla. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether a plaintiff is disabled, an ALJ must employ a five-step inquiry:

1. Whether the plaintiff is currently working;

2. Whether the plaintiff suffers from a severe impairment;

3. Whether the impairment is listed in Appendix 1 of the relevant regulations;

16

4.   Whether the impairment prevents the plaintiff from continuing her past relevant work; and

5.   Whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry, supra*, 675 F.2d at 467. If a plaintiff is either found to be disabled or not disabled at any step in this five-step inquiry, the ALJ's review ends.

20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The ALJ, however, has an affirmative duty to develop the record.  *See Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) ("The need for this inquiry arises from the essentially nonadversarial nature of a benefits proceeding: the Secretary is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.") (citations omitted).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental requirements of the work she has done in the past.

20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work in light of her residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

After reviewing both party's memoranda of law and the administrative record, several issues have come to the attention of this Court which must be addressed. These issues affect multiple parts of the five step inquiry process. The Court will therefore address these issues one at a time rather than discussing one step of the inquiry process at a time.

## B. *The ALJ Failed to Develop the Record*

### i. *RFC Assessment*

In his decision, the ALJ determined that Alberalla has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967 (b). [14.] 20 C.F.R. § 404.1567 (a) offers the following definition of sedentary work:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567 (a) and 416.967 (a). The ALJ found that Alberalla's residual functional capacity was limited beyond the full range of sedentary work, stating that she "is limited to simple, repetitive and routine tasks in a low stress, low contact work environment," and that she "should not work in unventilated work areas containing high concentrations of dust, fumes, gases and vapors." [14.] In making this assessment, the ALJ specifically noted that Alberalla could sit for a normal eight hour workday with only normal breaks and meal periods, stand and walk on an occasional basis for up to two hours in an eight hour workday, and lift and carry up to ten pounds on an occasional basis in an eight hour workday. [*Id.*] These assertions are not supported by the medical record as a whole.

The first issue that draws the Court's attention in this case is the ALJ's assertion that Alberalla can sit for a normal eight hour workday with only normal breaks and meal periods. The ALJ noted in his decision that he gave little weight to the assessment of J. Dale, M.D., because Dr. Dale did not address Alberalla's ability to sit, stand, or walk, and these "are the functions most affected by her symptoms." [18.] There is no point in his decision, however, where the ALJ definitively states how long Alberalla can sit at a time. The ALJ notes that he gave significant

18

weight to Dr. Dave's opinion because "it is consistent with the examination results, the claimant's treatment results and the description of the claimant's symptoms when she presents for treatment." [16.] That being said, the record does not contain a statement from Dr. Dave or any other medical source which states that Alberalla can sit for eight hours at a time with normal breaks and meal periods.

On May 4, 2010, M. Callahan submitted a physical residual functional capacity assessment in which she indicated that Alberalla could sit for about six hours with normal breaks in a normal eight hour workday. [79.] On January 19, 2011, M. Murphy completed another physical residual functional capacity assessment in which she also indicated that Alberalla could sit for about six hours with normal breaks in a normal eight hour workday. [86.] For the purposes of these two assessments, both Callahan and Murphy were single decision makers ("SDM"). [83, 90.] These two assessments are therefore immaterial at this level, because "SDM-completed forms are not opinion evidence at the appeals level." *See* POMS § DI 24510.050(C).

SSR 96-8p explains the Social Security Administration's policies regarding the assessment of residual functional capacity. The list of purposes for the ruling includes the following:

> 4. The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

Social Security Ruling 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184. Specifically, and relevant to the instant matter, the physical abilities this ruling refers to are sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching. 20 C.F.R 404.1545(b); 20 C.F.R. 416.945(b). It is worth noting that an ALJ's failure to provide a

19

function-by-function analysis of a claimant's residual functional capacity does not itself require remand, so long as the residual functional capacity is otherwise supported by substantial evidence. *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 313 (W.D.N.Y. 2013). The Second Circuit has recently ruled on this issue, stating the following:

> Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.

*Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). In this case, the ALJ provided a function-by-function analysis of Alberalla's ability to sit, stand, walk, lift, and carry. [14.] That being said, his residual functional capacity assessment constitutes legal error, requiring remand, not only because the ALJ fails to cite any medical source or other evidence supporting the assertion that Alberalla can sit for eight hours, but because no such evidence exists in the administrative record.

Although an explicit function-by-function analysis is not required, substantial evidence must support the ALJ's residual functional capacity assessment. In this case, the ALJ determined that Alberalla could sit for a normal eight hour workday with only normal breaks and meal periods without any medical evidence or opinion testimony indicating that she is in fact capable of doing so. The only definitive statement in the administrative record regarding how long Alberalla can sit at a time occurs in the hearing testimony she gave before the ALJ. During the hearing, the ALJ asked Alberalla how long she can stand before she has to sit or lay down, to which she replied "half hour." [51.] The ALJ then asked how long she can sit at a time before she needs to stand up because of her legs, to which Alberalla replied "about an hour." [52.] This

obviously contradicts the ALJ's claim that Alberalla can sit for an eight hour workday with normal meal periods and breaks.

The Commissioner correctly noted that "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). Even with *Halloran* in mind, however, the ALJ erred in his determination that Alberalla could perform sedentary work. The only evidence in the record regarding how long Alberalla could sit at a time, even with the ability to move around, is found in the hearing testimony:

> ALJ:   […] you said that you could sit for 30 minutes or you could sit for a while. If you were to alternate sitting and standing, how long could you continue to do that before you would have to lay down or recline to where you're making yourself as comfortable as possible, but alternating sitting and standing? How long could you do it?

> A:      I never tried it.

> ALJ:   You do it all day long. What do you do at home? Are you laying down at home or reclining?

> A:      I take a nap a couple times during the day.

> […]

> ALJ:   How long are you alternating sitting/standing before you take those naps, ma'am?

> A:      Three hours.

> ALJ:   How long are you[r] naps for?

> A:      About an hour.

> ALJ:   So you're down generally an hour for every three hours that you're up?

> A:      Pretty much.

[52-53.] This is the only testimony in the record which quantitatively reflects how long Alberalla can sit, including the frequency and duration of breaks she requires from sitting. When pressed, Alberalla clearly states that she can alternate sitting and standing for only three hours before she requires an hour-long break, here characterized as a nap. [53.] Three hours working followed by an hour long break is inconsistent with the ALJ's determination that Alberalla could sit for an eight hour workday with normal breaks and meal periods. Because the record contains no evidence which contradicts this testimony, the ALJ had an obligation to either accept it or develop the medical record to determine Alberalla's functional limitations. Without any other evidence relating to how long she can sit at a time, deviating from Alberalla's hearing testimony necessarily means that the ALJ's determination is not supported by substantial evidence.

## ii. *Vocational Expert Testimony*

The second issue which draws the Court's attention in this case occurs during the questioning of James Phillips, the vocational expert consulted in this case. Near the beginning of his testimony, the ALJ elicits a vocational profile from the vocational expert. [72.] Alberalla's vocational profile is described as a younger individual with a limited education and unskilled work experience in the light to medium exertional range. [*See* 72-73.] Alberalla raises no objection here, and it appears to this Court that this vocational profile is appropriate and was reached without issue.

After determining Alberalla's vocational profile, the ALJ poses a hypothetical question to the vocational expert:

> ALJ:  I want you to assume some things for me. I want you to assume an individual with the vocational profile you've just given me. Such an individual could sit for an hour, stand for 30 minutes.
>     Alternate sitting and standing for three hours without having to recline or lie down for an hour. Walk about half a block, lift 20-30 pounds. If those were my findings, could such a[n] individual perform any of the claimant's past work?

VE:    No.

ALJ:   Why not?

VE:    You really don't have enough capacity with the standing. You'd have to stand on these jobs. Taking a break after three hours, even if you could alternate, would take a person out of those jobs.

ALJ:   No work?

VE:    No work.

[73-74.] The limitations set forth by the ALJ in this hypothetical reflect the limitations Alberalla claimed during the hearing. This hypothetical was posed properly, and this exchange therefore represents an adequate basis for the ALJ's determination that Alberalla cannot return to her prior work at step four of the five step inquiry process.

The ALJ then posed a different hypothetical to the vocational expert:

ALJ:   Let's take another one. This hypothetical I want you to assume the individual could sit for an eight-hour workday with only normal breaks and meal periods. Stand/walk occasionally up to two hours in an eight-hour workday. Lift/carry occasionally. Limited to simple, repetitive and routine tasks in a low stress, low contact work environment. Should not work in unventilated work areas that contain high concentrations of dusts, fumes, gases and vapors. Could such a hypothetical individual perform the claimant's past work?

VE:    No, this is really more at the sedentary level. The jobs were in the light or as done, medium level.

ALJ:   Would there be sedentary work in the national economy such a person could work?

VE:    It would not preclude the full range of sedentary work I suppose.

[74.] The vocational expert goes on to say that such a hypothetical person could work as a laundry folder or toy assembler. [75.] In his decision, the ALJ adopts the vocational expert's answers to this hypothetical at step five of the inquiry process. *See* [19.] This constitutes legal error, requiring remand. This District has held that "in order for the ALJ to consider the

23

vocational expert's testimony, the posed hypothetical must accurately portray the claimant's individual impairments," and furthermore "if the record does not support the assumptions in the hypothetical, the vocational expert's opinion has no evidentiary value." *McAuliffe v. Barnhart*, 571 F. Supp. 2d 400, 405 (W.D.N.Y. 2008) (citations omitted). In the instant matter, the hypothetical on which the ALJ relied for step five assumed that Alberalla could sit for an eight-hour workday with only normal breaks and meal periods. This assumption is not supported by the record, and therefore the vocational expert's response has no evidentiary value. The ALJ's determination at step five is therefore not supported by substantial evidence, requiring remand.

### iii. *PTSD Evidence*

One of the impairments listed by Alberalla when she filed for DIB and SSI was PTSD. [214.] Despite the fact that Alberalla alleged disability due to PTSD, the ALJ neglected to rule on its severity or impact on Alberalla's life. It is worth noting that Alberalla didn't merely state that she has PTSD, but D. Mangold, the medical consultant who completed a psychiatric review and mental residual functional capacity assessment of Alberalla on May 3, 2010, assessed Alberalla as suffering from PTSD. [323, 330.]

Dr. Weinstein, one of Alberalla's psychiatrists, met with Alberalla for at least five different sessions. [651-655.] Based on her experience and her time with Alberalla, Dr. Weinstein diagnosed Alberalla with PTSD. [643.] Dr. Mostert, another psychiatrist who met with Alberalla for at least five different treatment sessions, also diagnosed Alberalla with PTSD. [338-342.] Dr. Dave, who conducted an internal medicine consultative examination, also diagnosed Alberalla with PTSD. [590.] Though Dr. Dave's opinions regarding Alberalla's mental health may bear less weight than the opinions of a mental health examiner, it is worth noting that he diagnosed Alberalla with PTSD because the ALJ in this case "[gave] greatest

weight to the opinions of Dr. Dave and Dr. Santarpia." [18.] (internal citations omitted). It has

been well-established in this District that "[i]t is a fundamental tenet of Social Security law that

an ALJ cannot pick and choose only parts of a medical opinion that support his determination."

*Caternolo v. Astrue*, No. 6:11-CV-6601, 2013 U.S. Dist. LEXIS 60886, at *23 (W.D.N.Y. 2013)

(quoting *Nix v. Astrue*, No. 07-CV-344, 2009 U.S. Dist. LEXIS 98356, 2009 WL 3429616, at *6

(W.D.N.Y. Oct. 22, 2009)); citing *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004);

citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *accord, e.g., Correale-Englehart

v. Astrue*, 687 F. Supp. 2d 396, 439 (S.D.N.Y. 2010).

Determining whether or not Alberalla has PTSD is not within the purview of this Court.

This Court is concerned with a procedural matter, specifically the fact that the record indicates

that the ALJ failed to assess whether Alberalla suffered from PTSD and to what degree it

impacted her life. Considering the multiple diagnoses of PTSD which can be found in the

administrative record, as well as the fact that Alberalla presented PTSD as one of the

impairments causing her to be disabled, it is this Court's opinion that the impairment should have

been considered. The ALJ, however, fails to evaluate the severity of Alberalla's PTSD at step

two of the five step inquiry process, constituting legal error. [*See* 12.] The ALJ mentions PTSD

only once in his decision, stating "[t]he claimant complained of symptoms of panic, depression,

obsessive compulsive disorder and post-traumatic stress disorder." [16.]

The ALJ's failure to assess Alberalla's PTSD is particularly problematic because of a

particular exchange during the hearing:

ATTY:      The record has also indicated a diagnosis of PTSD.

ALJ:       Don't go into it, Counselor. It's in the record unless it reflects on a
different problem than what she's already testified to, all it can do is produce a
result that I don't want to see in the hearing. Do you follow me?

ATTY:        Um-hmm.

ALJ:         You've indicated that she has that diagnosis. She knows she has that diagnosis, and she knows why. We all both know why. I don't want to upset her during this hearing. Unless it reflects itself in a different type of symptomotology or something different other than her anxiety and panic, depression and anxiety, then don't go there.

[66.] Though the ALJ may have cut off Alberalla's testimony with noble intentions, doing so constitutes legal error, requiring remand. First and foremost, Social Security Regulations clearly state that any party to a hearing has a right not only to appear, but to present evidence before an ALJ. *See* SSR 77-4; *see also* SSR 79.19. By preventing Alberalla from testifying about PTSD, one of her allegedly disabling impairments, the ALJ effectively denied her right to a hearing.

This issue becomes even more problematic when considering the step three implications. At step three of the five step inquiry process, an ALJ must determine whether the claimant has an impairment or combination of impairments which equal a listing under 20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 12.06 covers anxiety-related disorders, and it is satisfied when the criteria of both sections A and B are satisfied, or when the criteria of both sections A and C are satisfied. Section A calls for "medically documented findings" of either "a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation"; or "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week"; or "recurrent obsessions or compulsions which are a source of marked distress"; or "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress"; or "generalized persistent anxiety accompanied by three out of four of the following signs or symptoms": motor tension, or autonomic hyperactivity, or

apprehensive expectation, or vigilance and scanning.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

If it is determined that a claimant meets the requirements of part A, he or she must still meet the criteria in part B or part C of section 12.06 in order to be qualified as disabled at step three. *Id.* Step B is met if the claimant suffers from at least two of the following: "marked restriction of activities of daily living"; "marked difficulties in maintaining social functioning"; "marked difficulties in maintaining concentration, persistence, or pace"; "repeated episodes of decompensation, each of extended duration." *Id.* If a claimant meets the criteria in part A, explained above, but does not satisfy the requirements of part B, she must still be found disabled at step three of the five step inquiry process if she is completely unable to function independently outside the area of her home, as explained in part C. *Id.*

Based on the evidence in the record, it appears that Alberalla satisfies part A because of her recurrent panic attacks and because of her recurrent recollections or flashbacks of traumatic experiences. Alberalla does not seem to meet the condition of part C, but she would still be disabled per se if she met the criteria for part B.

On May 3, 2010, D. Mangold determined that Alberalla's psychological impairments caused moderate limitations in her activities of daily living; her ability to maintain social functioning; and her ability to maintain concentration, persistence, or pace. [328.] On January 14, 2011, T. Andrews determined that Alberalla's psychological impairments caused only mild limitations to her activities of daily living and her ability to maintain concentration, persistence, or pace, and caused moderate difficulties in maintaining social functioning. [602.] Neither Mangold nor Andrews found that Alberalla had suffered from any episodes of deterioration of extended duration. [328, 602.] Neither of these assessments satisfies the part B criteria which

would classify Alberalla as disabled, yet it is worth noting that Mangold's evaluation was made before the application in dispute was filed. Furthermore, the ALJ did not reference the Mangold report, the Andrews report, or any other report of Alberalla's "paragraph B" criteria in his decision. Specifically, the ALJ noted that Alberalla had a mild restriction in activities of daily living because she could care for her personal needs, fold laundry, "perform some meal preparation," grocery shop, and get to the methadone clinic. [13.] He noted that Alberalla had a moderate limitation in her social functioning because she "does not like to be around others or crowds." [*Id.*] Finally, he noted that Alberalla had only a mild restriction in concentration, persistence, or pace because she sometimes watches television for up to a half hour at a time, drives, and enjoys reading and crossword puzzles. [*Id.*]

It has been well established in this Circuit that "the Social Security Act is a remedial statute, to be broadly construed and liberally applied." *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988) (quoting *Gold v. Sec. of Health, Educ. and Welfare*, 463 F.2d 38, 41 (2d Cir. 1972)). It has further been established that "a claimant need not be an invalid to be found disabled under Title XVI of the Social Security Act." *Id.* (quoting *Murdaugh v. Secretary of Health and Human Servs.*, 837 F.2d 99, 102 (2d Cir. 1988)). With these principles in mind, the ALJ's determination of Alberalla's functional limitations in the "paragraph B" criteria is not supported by substantial evidence. In Dr. Santarpia's psychiatric evaluation, one of the documents to which the ALJ attributed the greatest weight, she notes that Alberalla is reliant on public transportation, specifically the bus system. [581.] Dr. Santarpia then notes that Alberalla suffers from panic attacks which are "situationally specific" and tend to occur when she is on a bus or in crowded spaces. [582.] It is this Court's opinion that severe panic attacks which are triggered by riding the bus cause more than a moderate restriction on the activities of daily living

of a person who relies upon buses for transportation. Dr. Santarpia further notes that Alberalla "denies socialization with friends," which suggests to this Court more than a moderate limitation in social functioning. [583.] This is further supported by the ALJ's own statement that "[t]he claimant reports that she does not like to be around others or crowds." [13.]

The administrative record indicates that Alberalla nearly qualifies as disabled under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Because it appears that she may qualify under the listing, it is not only possible, but probable that Alberalla's testimony would reveal the extent of her limitations from PTSD, thereby clarifying whether or not she is disabled under the listing. If the administrative record had little to no evidence to support her claims, the ALJ may have committed harmless error by preventing testimony. In this case, however, Alberalla's testimony was critical for determining whether or not she is disabled. The ALJ therefore committed legal error by preventing Alberalla from testifying about her PTSD, requiring remand.

## C. *Appeals Council*

Alberalla argues that the new evidence submitted to the Appeals Council was new, material, and related to the relevant period. (Dkt. No. 17). Alberalla further argues that this new evidence undermines the ALJ's initial decision, and therefore the Appeals Council committed legal error, requiring remand, by accepting the new evidence and affirming the ALJ's decision. This argument is unavailing.

Though the Appeals Council failed to specifically state why it did not feel the new evidence undermined the ALJ's decision, this is harmless error at most. Six new exhibits were submitted to the Appeals Council in this case, five from medical sources and one brief from Alberalla's representative. [4.] Of the five medical exhibits, the first is a collection of treatment notes from Dr. Weinstein covering February 22, 2012, to July 09, 2012, none of which provide

any new, material information. [650-655.] The second medical exhibit is a collection of treatment notes from Nasir Khan, M.D., covering May 27, 2011, to July 18, 2012, and none of these records provide new, material information either. [656-682.] The Appeals Council also received medical records from Dr. Carrel, dated March 13, 2012, to July 31, 2012, none of which provided new, material information for this case. [689-693.] Finally, the Appeals Council accepted two exhibits created by Dr. Yossef, Alberalla's treating physician. The first document is a physical residual functional capacity questionnaire, which he completed on August 13, 2012. [688.] This document consists of a number of questions and prompts, some of which leave space for a physician to write in answers while others offer several choices to select. If Dr. Yossef had filled out this form in its entirety, the exhibit may have been new, material, and it may have required Appeals Council action. Unfortunately, Dr. Yossef failed to answer a significant number of questions, including several that are critical to this case. [683-688.] As it was submitted, this form is not nearly complete enough to undermine the ALJ's decision.

The final exhibit submitted to the Appeals Council was an undated letter, signed by Dr. Yossef. [695.] This letter indicates that Alberalla is a patient at ECMC, has a history of PVD that limits her ability to walk or stand, and that Dr. Yossef does not think Alberalla can work in an occupation which would require her to walk or stand for extended periods. [*Id.*] Dr. Yossef further opines that Alberalla is not a good candidate for surgery, and that she may qualify for disability "if these conditions limit her ability to find a suitable occupation." [*Id.*] All of the facts contained within this letter were already part of the administrative record before the ALJ rendered his decision, the opinion that Alberalla is not a suitable candidate for surgery is neither new nor material, and the assertion regarding whether or not Alberalla qualifies for disability is both vague and solely up to the discretion of the Commissioner. This exhibit, like the others

submitted to the Appeals Council, does not undermine the ALJ's decision, and therefore the Appeals Council did not commit any error which requires remand.

In recommending remand, the Court takes no position at this time as to the ultimate issue of disability. The Commissioner will assess disability on the expanded record in the first instance. For that reason, the Court recommends denying Alberalla any other relief, but without prejudice to revisit substantive issues after completion of the record.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Alberalla's motion (Dkt. No. 17) in part, to vacate the Commissioner's determination and to remand the case for a full assessment after the medical record has been completed. The Court recommends denying Alberalla's motion without prejudice to the extent that it seeks any other relief. The Court further recommends denying the Commissioner's motion (Dkt. No. 18).

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s/ Hugh B. Scott_____
**HONORABLE HUGH B. SCOTT**
**UNITED STATES MAGISTRATE JUDGE**

DATED: August 22, 2014

31